# ILLINOIS OFFICIAL REPORTS

## Supreme Court

---

**People ex rel. Illinois Department of Corrections v. Hawkins, 2011 IL 110792**

---

| | |
|---|---|
| Caption in Supreme Court: | THE PEOPLE OF THE STATE OF ILLINOIS *ex rel.* ILLINOIS DEPARTMENT OF CORRECTIONS, Appellee, v. KENSLEY HAWKINS, Appellant. |
| Docket No. | 110792 |
| Filed | June 16, 2011 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Where, pursuant to provisions of the Unified Code of Corrections, the Department of Corrections deducted portions of an inmate's prison wages earned during incarceration for expenses arising from that incarceration, with his remaining prison wages placed in a bank account that reached approximately $11,000, and suit was brought by the Attorney General seeking over $455,000 as reimbursement under section 3–7–6 of the Code for the state's "cost of the care, custody, treatment and rehabilitation provided to" defendant, the supreme court found that, although the relevant statutory language in the Code might be ambiguous, legislative intent reveals that prison wages from which partial deductions have been made should not be the subject of further recovery attempts by the state. |
| Decision Under Review | Appeal from the Appellate Court for the Third District, reported at 402 Ill. App. 3d 204; heard in that court on appeal from the Circuit Court of Will County, the Hon. Bobbi N. Petrungaro, Judge, presiding. |
| Judgment | Appellate court judgment reversed;<br>circuit court judgment affirmed in part and vacated in part. |

Counsel on
Appeal

Benjamin C. Weinberg, of SNR Denton US LLP, of Chicago, and Paul E.B. Glad and David R. Simonton, of Sonnenschein Nath & Rosenthal LLP, of San Francisco, California, for appellant.

Lisa Madigan, Attorney General, of Springfield (Michael A. Scodro, Solicitor General, and Christopher M.R. Turner, Assistant Attorney General, of Chicago, of counsel), for appellee.

Steven F. Pflaum and John J. Scharkey, of Neal, Gerber & Eisenberg LLP, of Chicago, for *amicus curiae* The Institute for People with Criminal Records.

Justices

JUSTICE GARMAN delivered the judgment of the court, with opinion.

Chief Justice Kilbride and Justices Thomas, Burke, and Theis concurred in the judgment and opinion.

Justice Karmeier specially concurred, with opinion, joined by Justice Freeman

## OPINION

¶ 1  Plaintiff, the Illinois Department of Corrections, brought suit against defendant Kensley Hawkins to recover the costs of Hawkins' incarceration. After cross-motions for summary judgment, the circuit court of Will County entered judgment in favor of the Department against defendant for $455,203.14. However, the court precluded the Department from satisfying any of the judgment out of the money defendant had earned while working for prison industry. Both parties appealed. The appellate court affirmed the judgment against defendant, but it reversed the trial court's decision with respect to defendant's prison earnings. 402 Ill. App. 3d 204. Defendant appealed, and we now reverse in part and affirm in part.

¶ 2  BACKGROUND

¶ 3  This case arises out of several related sections of the Unified Code of Corrections (730 ILCS 5/1–1–1 *et seq.* (West 2008)).[1] Section 3–7–6(a) of the Unified Code of Corrections

---

[1]As discussed below, this case was originally filed in 2005. However, no relevant changes have been made to the cited statutes since that time, and so we refer to the most recent versions.

(730 ILCS 5/3–7–6(a) (West 2008)) establishes the responsibility of a "committed person" for the costs of his or her incarceration:

> "(a) Responsibility of committed persons. For the purposes of this Section, 'committed persons' mean those persons who through judicial determination have been placed in the custody of the Department on the basis of a conviction as an adult. Committed persons shall be responsible to reimburse the Department for the expenses incurred by their incarceration at a rate to be determined by the Department in accordance with this Section." 730 ILCS 5/3–7–6(a) (West 2008).

Section 3–7–6(a)(1) requires committed persons to "fully cooperate with the Department by providing complete financial information for the purposes under this Section." Section 3–7–6(a–5) directs the Department to develop a form to use to collect information from inmates, including

> "the age and marital status of [the] committed person, the number and ages of children of the person, the number and ages of other dependents, the type and value of real estate, the type and value of personal property, cash and bank accounts, the location of any lock boxes, the type and value of investments, pensions and annuities and any other personalty of significant cash value, including but not limited to jewelry, art work and collectibles, and all medical or dental insurance policies covering the committed person. The form may also provide for other information deemed pertinent by the Department in the investigation of a committed person's assets." 730 ILCS 5/3–7–6(a–5)(2) (West 2008).

¶ 4 Section 3–7–6(b) establishes the rate at which the costs of incarceration shall be calculated as "the average per capita cost per day for all inmates of that institution or facility for that fiscal year," and it describes how the Department is to calculate that cost. 730 ILCS 5/3–7–6(b) (West 2008). Section 3–7–6(c) provides how the costs calculated under section 3–7–6(b) may be proved. 730 ILCS 5/3–7–6(c) (West 2008).

¶ 5 Section 3–7–6(d), entitled "Authority," defines when an action may be pursued to collect reimbursement from a committed person:

> "The Director [of the Department], or the Director's designee, may, when he or she knows or reasonably believes that a committed person, or the estate of that person, has assets which may be used to satisfy all or part of a judgment rendered under this Act, or when he or she knows or reasonably believes that a committed person is engaged in gang-related activity and has a substantial sum of money or other assets, provide for the forwarding to the Attorney General of a report on the committed person and that report shall contain a completed form under subsection (a–5) together with all other information available concerning the assets of the committed person and an estimate of the total expenses for that committed person, and authorize the Attorney General to institute proceedings to require the persons, or the estates of the persons, to reimburse the Department for the expenses incurred by their incarceration. The Attorney General, upon authorization of the Director, or the Director's designee, shall institute actions on behalf of the Department and pursue claims on the Department's behalf in probate and bankruptcy proceedings, to recover

from committed persons the expenses incurred by their confinement. For purposes of this subsection (d), 'gang-related' activity has the meaning ascribed to it in Section 10 of the Illinois Streetgang Terrorism Omnibus Prevention Act." 730 ILCS 5/3–7–6(d) (West 2008).

¶ 6        The last subsection, section 3–7–6(e), provides:

"(e) Scope and limitations.

(1) No action under this Section shall be initiated more than 2 years after the release or death of the committed person in question.

(2) The death of a convicted person, by execution or otherwise, while committed to a Department correctional institution or facility shall not act as a bar to any action or proceeding under this Section.

(3) The assets of a committed person, for the purposes of this Section, shall include any property, tangible or intangible, real or personal, belonging to or due to a committed or formerly committed person including income or payments to the person from social security, worker's compensation, veteran's compensation, pension benefits, or from any other source whatsoever and any and all assets and property of whatever character held in the name of the person, held for the benefit of the person, or payable or otherwise deliverable to the person. Any trust, or portion of a trust, of which a convicted person is a beneficiary, shall be construed as an asset of the person, to the extent that benefits thereunder are required to be paid to the person, or shall in fact be paid to the person. At the time of a legal proceeding by the Attorney General under this Section, if it appears that the committed person has any assets which ought to be subjected to the claim of the Department under this Section, the court may issue an order requiring any person, corporation, or other legal entity possessed or having custody of those assets to appropriate any of the assets or a portion thereof toward reimbursing the Department as provided for under this Section. No provision of this Section shall be construed in violation of any State or federal limitation on the collection of money judgments.

(4) Nothing in this Section shall preclude the Department from applying federal benefits that are specifically provided for the care and treatment of a committed person toward the cost of care provided by a State facility or private agency." 730 ILCS 5/3–7–6(e) (West 2008).

¶ 7        Also at issue in this case is section 3–12–5 of the Code, which involves compensation paid to incarcerated persons who work while incarcerated. That section provides:

"§ 3–12–5. Compensation. Persons performing a work assignment under subsection (a) of Section 3–12–2 [730 ILCS 5/3–12–2(a)] may receive wages under rules and regulations of the Department. In determining rates of compensation, the Department shall consider the effort, skill and economic value of the work performed. Compensation may be given to persons who participate in other programs of the Department. Of the compensation earned pursuant to this Section, a portion, as determined by the Department, shall be used to offset the cost of the committed

person's incarceration. If the committed person files a lawsuit determined frivolous under Article XXII of the Code of Civil Procedure [735 ILCS 5/22–105], 50% of the compensation shall be used to offset the filing fees and costs of the lawsuit as provided in that Article until all fees and costs are paid in full. All other wages shall be deposited in the individual's account under rules and regulations of the Department. The Department shall notify the Attorney General of any compensation applied towards a satisfaction, in whole or in part, of the person's incarceration costs." 730 ILCS 5/3–12–5 (West 2008).

¶ 8        The specific facts of this case are not in dispute. Since July 1, 1983, defendant has been incarcerated at Stateville Correctional Center under the control of the Department. During that time, defendant has worked in a prison program assembling furniture. The money defendant earned from the program was deposited into defendant's prison account, and defendant began making regular transfers of money from his prison account into an account at the State Bank of Lincoln (the Lincoln account). When the present action was filed, the Lincoln account contained approximately $11,000.

¶ 9        On March 30, 2005, the Department filed a verified complaint seeking reimbursement from defendant in the amount of $455,953.74, citing section 3–7–6 of the Code. The complaint alleged that the amount reflected the "cost of the care, custody, treatment and rehabilitation provided to" defendant from July 1, 1983, to March 17, 2005, and that the Department had not received "any reimbursement payment from" defendant. The complaint further alleged that the Department "knows or reasonably believes that Kensley Hawkins has assets that may be used to satisfy all or part of a judgment rendered against him." Exhibit A to the complaint included the calculations used to arrive at the total costs of defendant's incarceration between July 1, 1983, and March 17, 2005, as provided in section 3–7–6(b).

¶ 10        On May 3, 2005, the circuit court granted the Department's motion to attach the Lincoln account. In September 2005, the attachment was vacated due to problems with service, but a substantially identical attachment order was entered August 29, 2006. The order excluded $4,000 of the Lincoln account "pursuant to 735 ILCS 5/12–1001." That section contains general exemptions related to the collection of civil judgments.

¶ 11        In his second amended answer, filed May 16, 2006, defendant asserted as an "affirmative defense" that he had "dutifully contributed toward his cost of incarceration" pursuant to section 3–12–5 (730 ILCS 5/3–12–5 (West 2008)). Defendant argued that 3% of his prison wages had already been applied to the costs of his incarceration, and he argued that it would be "unjust and unfair" to apply section 3–7–6 of the Code to require defendant to now turn over the rest of his compensation as well.

¶ 12        For reasons not relevant here, discovery continued until March 2008, when the parties filed cross-motions for summary judgment. The Department argued that it had satisfied its *prima facie* case under section 3–7–6 by satisfying all requirements of that section. Defendant's motion for summary judgment noted that a discovery deposition of the Department's designee had established that, contrary to the Department's assertion that it had received no reimbursement on defendant's behalf, 3% of defendant's compensation had been applied to offset the costs of his incarceration pursuant to section 3–12–5 of the Code. He

argued that section 3–12–5's provision that a "portion" of prisoner compensation shall be applied to the cost of incarceration was in conflict with section 3–7–6's apparently broad scope. He further argued that section 3–12–5 should be read as a limitation on section 3–7–6, and that if the legislature had meant to allow *all* of a prisoner's wages to be forfeited to reimburse the Department, section 3–12–5 would not provide that only a "portion" of the wages could be applied to the reimbursement.

¶ 13    Defendant also argued that the Department had failed to comply with the direction of section 3–12–5 to "notify the Attorney General of any compensation applied towards a satisfaction, in whole or in part, of the person's incarceration costs." Defendant asserted that the failure of the Department to notify the Attorney General that defendant had, in fact, paid 3% of his wages to satisfy the costs of his incarceration caused the Attorney General to file this action "based on erroneous information." He therefore asked the court to dismiss the action.

¶ 14    At the court's direction, the Department filed an additional affidavit pertaining to the amount of defendant's wages that had already been applied to the costs of his incarceration. According to the affidavit, defendant's total contribution was $750.60. Thus, the remaining costs sought by the Department totaled $455,203.14.

¶ 15    On February 25, 2009, the circuit court granted summary judgment for defendant. The court reviewed defendant's argument, concluding that "[t]he question is whether Section 3–12–5 precludes the application of Section 3–7–6 and thus precludes the Department from attaching the Defendant's bank account." The court found that the two sections were in conflict, and it noted the general rule of statutory construction that where two statutes conflict, the more specific statute controls over the more general, citing *State of Illinois v. Mikusch*, 138 Ill. 2d 242 (1990). The court further noted that section 3–12–5 is "more specific" than section 3–7–6. "Thus," the court held, "as Defendant has paid the amount he is obligated to pay under Section 3–12–5, and the remaining monies he received from his participation in the Correctional Employment Programs are not to be used for reimbursement." The court denied the Department's motion in its entirety.

¶ 16    Following the Department's motion for reconsideration, the court modified its judgment on April 23, 2009. It entered judgment for the Department in the amount of $455,203.14. However, the court still precluded the Department from satisfying the judgment out of the Lincoln account. It also vacated the prior attachment order. Later, the court granted the Department's motion to stay the judgment pending appeal.

¶ 17    Both parties appealed. The appellate court affirmed the judgment against defendant and reversed the circuit court's judgment with respect to the Lincoln account. The appellate court first noted that if the language of a statute is "clear and unambiguous, it must be applied as written, without resorting to further aids of statutory construction." 402 Ill. App. 3d at 211 (citing *Town & Country Utilities, Inc. v. Illinois Pollution Control Board*, 225 Ill. 2d 103, 117 (2007)). After reviewing sections 3–7–6 and 3–12–5, the court held:

    "Neither of the two statutes is ambiguous. Nor are the two statutes, when read together, contradictory. Contrary to the trial court's ruling, section 3–12–5 of the Code places no limitation upon the Department from later filing a civil suit, pursuant

-6-

to section 3–7–6, to attach a bank account, such as the one in the present case, that has been funded by prison earnings remaining after a section 3–12–5 offset has been taken. Moreover, as a matter of statutory construction, we cannot read such a limitation or exception into either of the two statutes." 402 Ill. App. 3d at 210.

¶ 18    Justice Lytton dissented, arguing that "allowing the Department to utilize section 3–7–6 of the Code to attach more than 3% to 5% [the range in which the Department's regulations have historically set the offset under section 3–12–5] of a prisoner's wages as reimbursement 'for expenses incurred by their incarceration' violates section 3–12–5 and the regulations promulgated thereunder." 402 Ill. App. 3d at 212 (Lytton, J., dissenting). Thus, the dissent argued, there was a conflict between the two sections. Relying on legislative history, Justice Lytton concluded allowing the Department to reclaim defendant's wages contravenes the legislative intent behind section 3–12–5. Like the circuit court, the dissent also referred to the general rule of statutory interpretation that when two statutes conflict, the more specific controls over the more general. Justice Lytton argued that section 3–12–5 specifically limits the amount that may be taken out of a prisoner's wages for reimbursement, while section 3–7–6 "generally addresses" the responsibility of committed persons for the costs of their incarceration.

¶ 19    With respect to defendant's cross-appeal, Justice Lytton also would have found that section 3–7–6 did not permit the Department to authorize the Attorney General to obtain a judgment against defendant. Because section 3–7–6(d) provides that the Department may so authorize the Attorney General only when the Department "knows or reasonably believes that a committed person, or the estate of that person, has assets which may be used to satisfy all or part of a judgment rendered under this Act, or when he or she knows or reasonably believes that a committed person is engaged in gang-related activity and has a substantial sum of money or other assets," and because Justice Lytton would have found that defendant's Lincoln account–his only assets–are not "assets which may be used to satisfy all or part of a judgment rendered under this Act," Justice Lytton concluded that this action was not properly authorized. 402 Ill. App. 3d at 214 (Lytton, J., dissenting).

¶ 20    We granted defendant's petition for leave to appeal pursuant to Supreme Court Rule 315(a) (Ill. S. Ct. R. 315(a) (eff. Feb. 26, 2010)). We also allowed The Institute for People with Criminal Records to file an *amicus curiae* brief in support of defendant.

¶ 21                                ANALYSIS

¶ 22    As noted above, this case raises two central questions. (1) May the Department satisfy a judgment under section 3–7–6 of the Code with wages earned in a prison program under section 3–12–5, when a portion of those wages has already been applied to the costs of the inmate's incarceration? And (2) was the action against defendant properly authorized by the Department pursuant to section 3–7–6(d)? Because the facts are not in dispute, both questions present only issues of statutory interpretation, which we review *de novo*. *Taylor v. Pekin Insurance Co.*, 231 Ill. 2d 390, 395 (2008).

¶ 23    When we construe statutes, our "primary objective" is to ascertain and give effect to the intent of the legislature. *MidAmerica Bank, FSB v. Charter One Bank, FSB*, 232 Ill. 2d 560,

565 (2009). The most reliable indication of the legislature's intent is the plain language of the statute. *Id*. Thus, when the language of the statute is clear and unambiguous, it must be applied as written without resort to extrinsic aids or tools of interpretation. *Id*.; *DeLuna v. Burciaga*, 223 Ill. 2d 49, 60 (2006). The statute should be read as a whole and construed so as to give effect to every word, clause, and sentence; we must not read a statute so as to render any part superfluous or meaningless. *Kraft, Inc. v. Edgar*, 138 Ill. 2d 178, 189 (1990). However, "we are not bound by the literal language of a statute if that language produces absurd or unjust results not contemplated by the legislature." *In re Donald A.G.*, 221 Ill. 2d 234, 246 (2006).

¶ 24 If the language of a statute is ambiguous, we may look to tools of interpretation to ascertain the intended meaning of a provision. *DeLuna*, 223 Ill. 2d at 59. When interpreting an ambiguous statute, we consider the purpose of the law, the evils it was intended to remedy, and the legislative history of the statute. *Stroger v. Regional Transportation Authority*, 201 Ill. 2d 508, 524 (2002). In so doing, we presume that several statutes relating to the same subject are governed by one spirit and a single policy, and that the legislature intended the several statutes to be consistent and harmonious. *DeLuna*, 223 Ill. 2d at 60. Thus, we may consider "similar and related enactments, though not strictly *in pari materia*." *Id*.; *Board of Education of City of Chicago v. A, C & S, Inc.*, 131 Ill. 2d 428, 468 (1989).

¶ 25 With these principles in mind, we turn to section 3–7–6 of the Code. As noted above, section 3–7–6(a) establishes that "[c]ommitted persons shall be responsible to reimburse the Department for the expenses incurred by their incarceration" at the rate defined in section 3–7–6(b) and calculated by the Department. 730 ILCS 5/3–7–6(a), (b) (West 2008). No limitation is created that exempts any particular committed persons, such as those who are unable to contribute to the costs of their incarceration. Thus, by its plain language, section 3–7–6(a) creates a broad liability for all committed persons to reimburse the Department. However, relevant to this appeal, section 3–7–6(a) contains no language that might indicate what funds may or may not be used to satisfy the committed person's obligation under the subsection.

¶ 26 Section 3–7–6(a–5), which directs the Department to gather information from committed persons, indicates that the Department may require committed persons to provide information "deemed pertinent by the Department in the investigation of a committed person's assets." 730 ILCS 5/3–7–6(a–5)(2) (West 2008). According to section 3–7–6(e)(3):

> "The assets of a committed person, for the purposes of this Section, shall include *any property*, tangible or intangible, real or personal, belonging to or due to a committed or formerly committed person including income or payments to the person from social security, worker's compensation, veteran's compensation, pension benefits, or *from any other source whatsoever* and *any and all assets and property of whatever character* held in the name of the person, held for the benefit of the person, or payable or otherwise deliverable to the person. Any trust, or portion of a trust, of which a convicted person is a beneficiary, shall be construed as an asset of the person, to the extent that benefits thereunder are required to be paid to the person, or shall in fact be paid to the person." (Emphases added.) 730 ILCS 5/3–7–6(e)(3) (West 2008).

¶ 27    Defendant ascribes significance to the fact that section 3–7–6(e)(3)'s broad definition of "assets" does not include prison wages earned pursuant to section 3–12–5 of the Code. However, as the Department points out, section 3–7–6(e)(3) includes "any property *** from any *** source whatsoever and any and all assets and property of whatever character" held by or for the committed person. 730 ILCS 5/3–7–6(e)(3) (West 2008). We agree with the Department that, under the plain language of the statute, "assets" includes wages earned by the committed person pursuant to section 3–12–5.

¶ 28    Our inquiry does not end there, however. Nothing in section 3–7–6 indicates that all "assets" of a committed person may be claimed by the Department for reimbursement purposes. Indeed, immediately after defining "assets" to include "any and all assets and property of whatever character," section 3–7–6(e)(3) goes on to state:

> "At the time of a legal proceeding by the Attorney General under this Section, if it appears that the committed person has any assets *which ought to be subjected to the claim of the Department under this Section*, the court may issue an order requiring any person, corporation, or other legal entity possessed or having custody of those assets to appropriate any of the assets or a portion thereof toward reimbursing the Department as provided for under this Section." (Emphasis added.) 730 ILCS 5/3–7–6(e)(3) (West 2008).

¶ 29    The section therefore does not permit the Department to attach and claim "any assets," but rather permits the Department to attach "any assets *which ought to be subjected to the claim of the Department under this Section*." By creating a class of "assets" which "ought to be subjected to the claim of the Department under this Section," section 3–7–6(e)(3) clearly indicates that some assets ought *not* be subjected to the claim of the Department. Read otherwise, such that the reach of the Department under section 3–7–6 extended to any "assets" at all, the phrase "which ought to be subjected to the claim of the Department under this Section" becomes superfluous. We further note that subsection (e)(3) is not the only part of section 3–7–6 to make such a distinction; section 3–7–6(d) permits the Department to authorize actions under the section when, *inter alia*, the Department "knows or reasonably believes that a committed person, or the estate of that person, has assets *which may be used to satisfy all or part of a judgment rendered under this Act*." (Emphasis added.) Thus, if any and all "assets" of a committed person may be subjected to the claim of the Department, we would have to find that section 3–7–6(d) and section 3–7–6(e)(3) both contain superfluous and unnecessary language. As we have discussed, our reading of the statute must not render any portion thereof meaningless or redundant. We therefore find that the better reading of the plain language is the one we have indicated: some "assets" of a committed person may not be "subjected to the claim of the Department" and may not "be used to satisfy all or part of a judgment rendered under" section 3–7–6.

¶ 30    Having determined that prison wages earned pursuant to section 3–12–5 are "assets," then, we must determine whether such wages are assets "which ought to be subjected to the claim of the Department under this Section." Here, section 3–7–6 is silent. Neither subsection (d) nor subsection (e)(3) specifies which assets should (or should not) be subjected to the claim of the Department. However, the remaining sentence of subsection (e)(3) provides: "No provision of this Section shall be construed in violation of any State or

federal limitation on the collection of money judgments." The Department concedes that pursuant to section 12–1001 of the Code of Civil Procedure (735 ILCS 5/12–1001 (West 2008)), the personal property exemption of the Code of Civil Procedure, $4,000 of defendant's "assets" are exempt from collection. As the Department notes in its brief, the personal property exemption, which exempts certain enumerated property "from judgment, attachment, or distress for rent," clearly constitutes a state "limitation on the collection of money judgments" under section 3–7–6(e)(3). Assets that are exempt from collection under the personal property exemption are thus also assets that ought not be "subjected to the claim of the Department under" section 3–7–6. However, it remains unclear from the plain language of section 3–7–6 whether any other type of "asset" is included in those that are not "subjected to the claim of the Department."

¶ 31     In light of the statute's silence, we find that section 3–7–6 is ambiguous as to what "assets" are subject to the claim of the Department. As noted above, we presume that several statutes relating to the same subject are governed by one spirit and a single policy, and that the legislature intended the several statutes to be consistent and harmonious. *DeLuna*, 223 Ill. 2d at 60. Section 3–12–5, on which defendant relies, contains several provisions relating to the same subject as section 3–7–6. After authorizing the Department to pay wages to those who work in prison programs, section 3–12–5 provides: "Of the compensation earned pursuant to this Section, a portion, as determined by the Department, shall be used to offset the cost of the committed person's incarceration." 730 ILCS 5/3–12–5 (West 2008). The section goes on to state: "All other wages shall be deposited in the individual's account under rules and regulations of the Department. The Department shall notify the Attorney General of any compensation applied towards a satisfaction, in whole or in part, of the person's incarceration costs." *Id*. Thus, although section 3–12–5 requires the committed person to contribute from his prison wages, it permits the Department to use only a "portion" for that purpose; "[a]ll other wages" must be deposited in the committed person's account.

¶ 32     Although we have held that the wages then become "assets" under section 3–7–6, the most consistent reading of these two statutes leads us to conclude that such wages are *not* assets "which ought to be subjected to the claim of the Department under" section 3–7–6. The Department maintains that, despite section 3–12–5's requirements that the Department remove only a "portion" of the wages to offset the costs of the person's incarceration and deposit "[a]ll other wages" into the worker's account, it can nonetheless claim all of those "other wages" (minus the personal property exemption) under section 3–7–6. The Department's reading would render section 3–12–5 an empty and meaningless formality. If the legislature intended for the portion of the committed person's wages that are remaining after a "portion" is used to offset the costs of his incarceration to be assets "which ought to be subjected to the claim of the Department under" section 3–7–6, there is no reason to require the Department to first ensure that the wages are "deposited in the individual's account under rules and regulations of the Department."

¶ 33     We note that such a reading would also contravene the intent supporting section 3–12–5, as expressed in the legislative history. The sponsor of the bill that amended section 3–12–5 to include the offset provision explained that the bill's purpose was to ensure that prisoners who are released from incarceration will have learned "a skill and a new work ethic" and also

-10-

will have "saved some money to come back into the community." 86th Ill. Gen. Assem., Senate Proceedings, May 25, 1989, at 429 (statements of Senator Collins). Requiring a committed person who has saved money while working in prison industry, such as defendant, to turn over all of that money to the Department does not permit him any money "to come back into the community." Indeed, the Department's interpretation means that defendant not only forfeits his money, but he also has a judgment against him in excess of $400,000.

¶ 34    As noted above, "we are not bound by the literal language of a statute if that language produces absurd or unjust results not contemplated by the legislature." *In re Donald A.G.*, 221 Ill. 2d at 246. Here, the Department's literal interpretation of sections 3–12–5 and 3–7–6 produces a result that is absurd, unjust, and that our analysis indicates was not contemplated by the legislature. We therefore reject that interpretation. Instead, we hold that once a committed person's wages have been properly subjected to the offset provision of section 3–12–5 of the Code, the remaining wages are not subject to collection under section 3–7–6. Because the Department concedes that the Lincoln account contains only wages that have already been subjected to section 3–12–5, the circuit court properly vacated the attachment of that account.

¶ 35    We next turn to defendant's remaining argument that this action was not authorized under section 3–7–6(d). As noted above, that subsection provides, in relevant part:

> "The Director [of the Department], or the Director's designee, may, when he or she knows or reasonably believes that a committed person, or the estate of that person, has assets which may be used to satisfy all or part of a judgment rendered under this Act, *** authorize the Attorney General to institute proceedings to require the persons, or the estates of the persons, to reimburse the Department for the expenses incurred by their incarceration." 730 ILCS 5/3–7–6(d) (West 2008).

¶ 36    The statute therefore clearly contemplates that the Department may authorize the Attorney General to file suit against a committed person even if, as here, the person is later found to have no "assets which may be used to satisfy all or part of a judgment rendered under" the section. The Department contends that it had a "reasonable belief" that defendant had such assets, and we agree. Although we have held that defendant's assets may not be used to satisfy a judgment against him in this case, our determination is one of first impression. In the absence of an authoritative interpretation of section 3–7–6, the Department's belief that defendant's assets were accessible under section 3–7–6 was a reasonable one.

¶ 37    However, our decision means that, in the future, if the Department knows or believes that a committed person's assets consist solely of prison wages pursuant to section 3–12–5, the Department will *not* "know[ ] or reasonably believe[ ]" that he or she "has assets which may be used to satisfy all or part of a judgment rendered under this Act." Thus, in the future, section 3–7–6(d) would not authorize an action identical to the present one against an identically situated defendant. In our view, it would be unjust and inequitable to refuse this defendant, whose efforts in this case will benefit those future litigants, the benefit of his efforts. We therefore reverse the judgment of the appellate court and vacate the judgment against defendant.

¶ 38                                    CONCLUSION

¶ 39    For the reasons stated above, we find that the circuit court properly vacated the attachment of the Lincoln account. The monetary judgment against defendant is also vacated. The judgment of the appellate court is reversed.

¶ 40    Appellate court judgment reversed;

¶ 41    circuit court judgment affirmed in part and vacated in part.

¶ 42    JUSTICE KARMEIER, specially concurring:

¶ 43    I fully agree with the majority that once a committed person's wages have been properly subjected to the offset provision of section 3–12–5 of the Unified Code of Corrections (730 ILCS 5/3–12–5 (West 2008)), that person's remaining wages are not subject to collection under section 3–7–6(a) of the Code (730 ILCS 5/3–7–6(a) (West 2008)). I also agree that the monetary judgment against defendant should be vacated. I write separately because I would reach that result for a somewhat different reason from the one expressed by my colleagues.

¶ 44    Where the language of a statute is clear and unambiguous, it must normally be applied as written without resorting to other aids of construction. *In re Estate of Ellis*, 236 Ill. 2d 45, 51 (2009). No one questions this fundamental rule of statutory construction. Nor is there any dispute that the "applied as written" rule has narrow but important exceptions. Where my colleagues and I differ is on which of those exceptions is applicable to this case.

¶ 45    The majority avoids the constraints of the "applied as written" principle by concluding that section 3–7–6 of the Code (730 ILCS 5/3–7–6(a) (West 2008)) is ambiguous as to what "assets" are subject to claims by the Department of Corrections. *Supra* ¶ 29. In my view, however, the appellate court was correct when it concluded that there was no ambiguity in either section 3–7–6 or section 3–12–5 of the Code. See 402 Ill. App. 3d at 210. Both provisions are clear and straightforward. The reason we must look beyond the literal language of the two statutes is different. It is that application of the plain and unambiguous language of section 3–7–6(a) of the Code (730 ILCS 5/3–7–6(a) (West 2008)) in the manner urged by the Department in this case would render section 3–12–5 of the Code (730 ILCS 5/3–12–5 (West 2008)) meaningless. Indeed, it would ultimately defeat the purposes of both provisions.

¶ 46    It is well established that when the plain language of one statute conflicts with the plain language of another, we must construe the enactments *in pari materia* when it is reasonably possible to do so. Legislative intent remains the paramount consideration, but in ascertaining that intent, we may properly consider the purpose of the statutes, the problems that they target, the goals that they seek to achieve, and the consequences which would follow from construing the law one way or the other. Where a general statutory provision and a more specific statutory provision relate to the same subject, we will presume that the legislature intended the more specific provision to govern. Similarly, we will presume that the legislature intended the more recent statutory provision to control. See *Moore v. Green*, 219

-12-

Ill. 2d 470, 479-80 (2006). And always, when dealing with seemingly conflicting statutes dealing with the same subject matter, we must strive to interpret the statutes in a way which avoids inconsistency and gives effect to both. *Ferguson v. McKenzie*, 202 Ill. 2d 304, 311-12 (2001).

¶ 47 Under these principles, the position espoused by the Department of Corrections in this case is untenable. Section 3–7–6 of the Code, which deals generally with the responsibility of persons committed to the Department of Corrections to reimburse the Department for the costs of incarceration, had been in effect for more than half a decade (see Ill. Rev. Stat. 1983, ch. 38, par. 1003–7–6 (added by Pub. Act 82–717, eff. July 1, 1982)) when the General Assembly took up the amendment to section 3–12–5 of the Code relevant to this case. That amendment was enacted in 1989 as part of Public Act 86–450, whose purpose was to expand prison industries in order to permit them to enter "into private partnership with private business in this State" and, in so doing, to "create more jobs, so that prison inmates can have an opportunity to go out and get jobs," "contribute part of the salaries that they earn while on [those] jobs *** to defray the costs for their incarceration," and to thereby help "reliev[e] the taxpayers in this State of some of the burden for the costs of housing our prison inmates," a burden which had become "much more than we can afford to pay." 86th Ill. Gen. Assem., Senate Proceedings, May 25, 1989, at 425 (statements of Senator Collins).

¶ 48 To achieve the goal of reducing the burden of incarceration costs on taxpayers, the newly expanded system required not only the creation of new jobs for prison inmates, but also the availability of a pool of prison inmates willing to work in those new jobs. The solution, contained in what was ultimately codified as section 3–12–5 of the Code (730 ILCS 5/3–12–5 (West 2008)), was to implement a system under which inmates were permitted to continue to receive wages for the work they performed, as was previously the case, but to now authorize the Department of Corrections to withhold a portion of any such wages in order to offset the costs of the inmate's incarceration. Under the amendment, it was left to the Department to determine the portion of inmate earnings it would withhold. All other wages were required to be "deposited in the individual's account under rules and regulations of the Department." 730 ILCS 5/3–12–5 (West 2008) (as amended by Pub. Act 86–450 (eff. Jan. 1, 1990)). An important byproduct of this system, in the view of the legislation's proponents, was that it would enable persons committed to the Department of Corrections to learn marketable skills, develop a work ethic to enable them to support themselves and their families following their release, and "save[ ] some money to come back into the community," thereby reducing the likelihood of recidivism. 86th Ill. Gen. Assem., Senate Proceedings, May 25, 1989, at 429-32 (statements of Senator Collins).

¶ 49 Under the construction of the law urged by the Department of Corrections, none of these objectives could be accomplished. If the Department were permitted to invoke section 3–7–6 of the Code of Corrections to seize what remained of an inmate's earnings from prison work after the Department had already withheld a portion of those earnings under section 3–12–5, persons committed to the Department would no longer have any incentive to work beyond the bare minimum necessary to pay for the items they wished to consume while in custody. That is so because any sums they managed to save would be subject to seizure. They would end up getting none of it.

¶ 50        Work may be its own reward for some, but probably not for most inmates in the Department of Corrections. Once inmates realized that the extra work necessary to generate savings would benefit only the Department of Corrections, not them, they would quickly reevaluate the utility of prison employment. The result would likely be a precipitous drop in the amount of labor available to prison industries. If the number of work hours plummeted, the various enterprises operated by prison industries would no longer be able to provide the services and produce the goods necessary to keep them economically viable. The income they generate would evaporate, and they would no longer be able to provide any meaningful contribution toward offsetting the substantial costs of maintaining this state's prisons. In addition, any real hope of providing inmates with marketable skills, instilling a work ethic, or improving their ability to support themselves and their families following their release would be lost. In the end, virtually the entire economic burden necessary to support this state's large and growing prison population, while they are incarcerated and after their release, would revert to Illinois' taxpayers. This result would directly contravene the public policy of Illinois as expressed by the General Assembly through the provisions of the Unified Code of Corrections at issue in this case.

¶ 51        Because this is clearly not what the General Assembly intended, the Director of Corrections could not reasonably have believed that savings accumulated by an inmate from prison earnings which had already been subject to the offset provision of section 3–12–5 of the Code qualified as an asset "which may be used to satisfy all or part of a judgment" under section 3–7–6 of the Code. That being the case, the Director was not authorized to initiate this action under section 3–7–6(d) of the Code. Because the action itself was not authorized, it necessarily follows that no lawful basis existed for attaching defendant's account at the State Bank of Lincoln. It is for these reasons, in my opinion, that the appellate court's judgment must be reversed and the judgment of the circuit court affirmed in part and vacated in part.

¶ 52        JUSTICE FREEMAN joins in this special concurrence.